**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**DOTHAN DIVISION**

| | |
|---|---|
| JAMES W. BAILEY, IV, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )  **CIVIL ACTION NO.: 1:10-cv-689-MEF-TFM** |
| | ) |
| SHERIFF ANDY R. HUGHES, et al., | ) |
| | ) |
|     **Defendants.** | ) |

**MEMORANDUM BRIEF IN SUPPORT OF DEFENDANTS ARMSTRONG, CHANCEY,**
**LANEY AND HARRISON'S MOTION TO DISMISS**

COME NOW the Defendants designated in the Plaintiff's Complaint as "Corrections Officer Armstrong", "Corrections Officer Chancey", "Corrections Officer Laney", and "Corrections Officer Harrison"[1] and submit this Memorandum Brief in support of their contemporaneously filed Motion to Dismiss.

**INTRODUCTION**

On August 13, 2010, the Plaintiff filed a fourteen-count Complaint alleging various violations of his federally protected rights. Said Complaint is a stereotypical shotgun complaint that is both long on novel theories and short on supportive facts. These Defendants, who are not alleged to have been present or even aware of the cell extraction of the Plaintiff that took place on August 13, 2008, are charged with everything from excessive force to a rather novel due process claim based upon their alleged failure to submit to the Plaintiff's demand that he see a supervisor before complying with the Defendants' commands. These claims are without merit. Accordingly, these Defendants request that the Court dismiss the Plaintiff's claims against them.

---

[1] The correct names of these Defendants are Joseph Armstrong, Adam Chancey, Kenneth Laney, and John Harrison.

**FACTS**

As an initial matter, the Plaintiff alleges that he was "either a pre-trial detainee or awaiting return to the Alabama Department of Corrections." (Doc 1 at ¶ 16.)[2]  However, the Plaintiff alleges that after the incident complained of he "was subsequently ***taken back to Holman Prison***." (Id. at ¶ 14 (emphasis added).)  Persons who are not already convicted are not ***taken back*** to prison.  Accordingly, the Plaintiff had to have been a convicted prisoner at all times relevant.

On August 13, 2008, the Complaint alleges that the Plaintiff was sleeping on his bed on the floor of his cell about two feet away from the toilet.  (Doc 1 at ¶ 2.)  At approximately 10:50 p.m., Corrections Officers Moon and Armstrong came to his cell purportedly on the orders of Sgt. Buchmann.  (Id. at ¶ 1.)  The Plaintiff and his cellmates left the cell and Corrections Officer Moon conducted a search.  (Id. at ¶ 3.)  The Plaintiff alleges that Corrections Officer Moon looked upset that he did not find any contraband in the cell but does not allege that Corrections Officer Armstrong did not find any contraband.  (See generally Doc 1 at ¶¶ 1-16.)  This failure is notable in that Corrections Officer Armstrong is later alleged to have returned carrying a knife, and Corrections Officer Leary (who was with Armstrong) is alleged to have told the Plaintiff that they needed to speak with him.  (Id. at ¶ 5.)

The Plaintiff alleges that he and his fellow cellmates were made to strip, squat, and cough in front of each other.  (Doc 1 at ¶ 4.)  In the Factual Allegations, the only statements Corrections Officer Moon is alleged to have made are for the Plaintiff "to stand and spread his butt-cheeks".  (Id.)  Later in the Complaint, the Plaintiff alleges in conclusory fashion that Moon made "verbal inappropriate remarks about the Plaintiff" but does not identify what those remarks were.  (Id. at

---

[2] The Complaint restarts its paragraph numbering with each section.  Unless stated otherwise, paragraph references are to the paragraph numbers in the Factual Allegations section of the Complaint.

p. 19.)  As alleged, it appears the "inappropriate remarks" were the orders for the Plaintiff to stand and spread his cheeks.

The Plaintiff further alleges that he reminded the corrections officers that he had a lawsuit against "them" (a blatant misrepresentation as this Court's own records – a proper subject of judicial notice – clearly demonstrate that Corrections Officer Moon was the only officer present who was a Defendant in Case No. 05-419).  (Doc 1 at ¶ 4; <u>see also</u> Exhibit A, Case Action Summary, <u>Bailey v. Ray Lee Bonin, et al.,</u> Case No. 1:05-cv-419-MHT-TFM.)[3]  The Plaintiff also alleges that he told the corrections officers that because of his ongoing lawsuit, that they were not to return unless they had a "sergeant/supervisor" with them – a nonsensical demand given that the earlier lawsuit included as defendants two sergeants, a commander, and the former-sheriff.  (<u>Id.</u>)  As the Complaint makes clear, the Plaintiff complied with the commands of the Corrections Officers during this first encounter, and no force was used against him or his cellmates.  (<u>Id.</u> at ¶¶ 1-5.)

Corrections Officers Moon and Armstrong are alleged to have left the cell and returned ten minutes later with Corrections Officer Leary.  (Doc 1 at ¶ 5.)  Corrections Officer Armstrong allegedly had a "black knife" in his hand and Corrections Officer Leary requested that the Plaintiff come out of the cell and speak to the Corrections Officers.  (<u>Id.</u>)  The Plaintiff refused. (<u>Id.</u>)  The Plaintiff repeated his nonsensical demand for a sergeant or supervisor.  (<u>Id.</u>) Corrections Officer Moon repeated the request for the Plaintiff to come out of the cell and the Plaintiff again refused.  (<u>Id.</u>)  The Corrections Officers left without using any force in response to the Plaintiff's non-compliance.  (<u>Id.</u>)

Ten minutes later, the same three Corrections Officers returned accompanied by Corrections Officers Chancey, Culbreth, Laney, Harrison, Phillips, and Jackson.  (Doc 1 at ¶ 6.)

---

[3] In fact, none of the Defendants in the case at bar were Defendants in the Plaintiff's previous suit.  (<u>Compare</u> Doc 1, <u>with</u> Exhibit A.)

The Corrections Officers had an active video camera. (Id. at ¶ 7.) Corrections Officer Leary opened the cell door and "asked" the Plaintiff to get on his knees. (Id.) The Plaintiff refused. (Id.) During this time, Corrections Officer Armstrong had a TASER activated and pointed at the Plaintiff. (Id.)[4] Corrections Officer Leary "advised" the Plaintiff for a second time to get on his knees, and the Plaintiff again refused repeating his demand for a supervisor and noting that he was "restrained" while in his cell. (Id. at ¶ 8.)

The Plaintiff was "advised" for a third time to get on his knees and explicitly warned that he would be shot with the TASER if he did not comply. (Doc 1 at ¶ 9.) Despite the Plaintiff's alleged statement that he feared for his life, he again refused to comply and stated he was not coming out of the cell unless a sergeant was present. (Id.) The Plaintiff's allegations defy all credibility as he had already left the cell once without anything happening to him, and at that point he was not being ordered out of the cell. (Id. at ¶¶ 2, 9.)

The Plaintiff alleges that Corrections Officer Leary and Corrections Officer Moon smiled before "he" shot the Plaintiff with a TASER. (Doc 1 at ¶ 10.)[5] The Plaintiff fell and pulled the wires from the TASER. (Id.) Although not specifically alleged, it would appear the Plaintiff was able to pull the wires free as he alleges he ran out of the cell without touching an officer. (Id. at ¶ 11.) The Plaintiff then alleges "*[a]s BAILEY ran away from the officers* he turned around, with his hands up and was shot again in the leg." (Id.) (Bold and italicized emphasis added, all caps emphasis in the original.) The Complaint alleges that as the Plaintiff "went down" he was kneed in the back and head and received a further discharge from the TASER

---

[4] Corrections Officer Armstrong is the only Corrections Officer alleged to be armed with a TASER in the Factual Allegations. (Doc 1 at ¶ 1-16.) However, the Plaintiff alleges in various counts that other Corrections Officers used TASERs on the Plaintiff, so it is assumed for purposes of this motion that Corrections Officers Leary and Chancey also had TASERs. (Doc 1 at pp. 22-25.)

[5] This allegation is particularly puzzling as even taking into account the Plaintiff's subsequent allegations in the Counts of his Complaint, nothing in the Complaint alleges that Corrections Officer Moon had a TASER. In fact, up until this point in the Complaint, only Corrections Officer Armstrong is alleged to have had a TASER. Consequently, counsel for the Defendants is left wondering who "he" was.

(presumably to his leg) and another discharge in his back. (Id.) Curiously, paragraph eleven contains no allegation that the Plaintiff was compliant or failing to resist after being shot with the TASER the second time. (Id.) The Plaintiff also does not inform the Court who it was that used the force described in paragraph eleven. (Id.)

The Plaintiff alleges that he was handcuffed and "shackled to the floor". (Doc 1 at ¶ 12.) From this point, the Plaintiff does not allege that any further force was used against him. (Id. at ¶¶ 12-16.) He does allege that about an hour later he was taken to Southeast Alabama Medical Center for removal of one TASER probe that remained in his leg. (Id. at ¶ 12.) He alleges that during the trip an unnamed transport officer told him his leg would probably fall off. (Id. at ¶ 13.) The Plaintiff alleges that he reported the comment to Sgt. Bonnin upon his return to the jail, but Sgt. Bonnin only laughed and told the Plaintiff to shut up. (Id.)

The Plaintiff alleges that he was placed in a cell without a toilet, sink, water, or food for approximately eight hours. (Doc 1 at ¶ 13.) Curiously, the Plaintiff alleges in the factual allegations only that he was placed in the cell – he does not allege who did it. (Id.) It is not until Count XIV that he alleges Houston County, Sgt. Buchmann, Sgt. Jones, Sgt. Reynolds, Corrections Officer Leary, Corrections Officer Armstrong, Corrections Officer Chancey, Corrections Officer Culbreth, Corrections Officer Laney, Corrections Officer Harrison, and Corrections Officer Phillips placed him in the cell. According to the Plaintiff, therefore, it took Houston County, three sergeants, and seven Corrections Officers to put him in the "closet cell". (Id. at pp. 36-37.)

The Court should note the timing of the Plaintiff's allegations. The initial encounter with the Plaintiff began at 10:54 p.m. on August 13, 2008. As alleged, there was a cell and inmate search, a ten-minute break, a short conversation followed by another ten-minute break, and an altercation followed by a trip to the hospital an hour later. (Id. at ¶¶ 1-13.) The only reasonable

5

inference is that the Plaintiff was asleep for that period as he would have been placed in the cell in the very early morning hours of August 14, 2008. Notably, the Plaintiff does not allege that he requested food, water, or toilet facilities during this period. (Id. at ¶¶ 1-16.)

The Plaintiff alleges that he was subsequently returned to Holman Prison. (Doc 1 at ¶ 14.) Allegedly, Sheriff Hughes and Sgt. Buchmann sent a letter requesting that DOC discipline the Plaintiff – apparently for the incident on August 13, 2008. (Id.) The Complaint alleges that the Plaintiff was not disciplined. (Id.) This is the only allegation in the Factual Allegations about Sheriff Hughes. (Id. at ¶¶ 1-16.)

In the Counts portion of the Complaint, the Plaintiff adds some additional allegations with respect to these Defendants. They are alleged to have decided to purchase TASERs for use in the jail. (Doc 1 at pp. 26-30.) The Plaintiff alleges that the jail was overcrowded, resulting in him sleeping on the floor. (Id. at pp. 30-31.) The Plaintiff alleges that these Defendants knew or should have known of the alleged overcrowding but provides no specific factual allegations to support these conclusory allegations. (Id.)

The Complaint is notable for what it does not allege. The Complaint does not allege that Corrections Officers Laney or Harrison used any force against the Plaintiff. It does not allege that any of these Defendants other than Corrections Officer Armstrong was aware of the Plaintiff's previous lawsuit. The Complaint does not allege that Sgt. Buchmann had no reason to suspect that there was contraband in the Plaintiff's cell prior to ordering the initial cell search. The Plaintiff does not allege that he suffered any mistreatment between the filing of his initial lawsuit and the incident that occurred on August 13, 2008. Finally, the Plaintiff does not allege that he has returned to the Houston County Jail in the two years following the incident or that he will return there any time in the future.[6] (Id.)

---

[6] Nor can he and survive a Rule 11 motion unscathed as the Plaintiff is serving life without the possibility of parole

## STANDARD OF REVIEW

The United States Supreme Court has rejected the "no set of facts" standard for determining the sufficiency of a complaint challenged by a Rule 12(b)(6) motion.  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) (overruling <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).[7]  Regarding <u>Conley</u>, the Supreme Court noted that the "no set of facts" language had been essentially taken out of context for fifty years.  550 U.S. at 562-63..  On "a focused and literal reading of <u>Conley's</u> 'no set of facts,' a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  <u>Id.</u> at 562.  Instead, the <u>Twombly</u> Court held that

> this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: ***once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint***.

550 U.S. at 563 (emphasis added).

What a complaint needs, in the <u>Twombly</u> Court's view, is facts.  As a general rule, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . ."  550 U.S. at 555.  However, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ."  <u>Id.</u> (citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . ."  <u>Id.</u>

---

in Holman Prison.

[7] <u>See also</u> <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336 (2005); <u>O'Brien v. DiGrazia</u>, 544 F.2d 543, 546, n.3 (C.A. 1 1976) ("[W]hen a plaintiff . . . supplies facts to support his claim, we do not think that <u>Conley</u> imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional . . . action into a substantial one"); <u>McGregor v. Industrial Excess Landfill, Inc.</u>, 856 F.2d 39, 42-43 (C.A. 6 1988) (quoting <u>O'Brien's</u> analysis).

Even under Rule 8(a) there must be a "'statement of circumstances occurrences, and events in support of the claim presented' and . . . not . . . a pleader's 'bare averment that he wants relief and is entitled to it.'" Twombly, 550 U.S. at 555 (citations omitted). "Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing only 'fair notice' of the nature of the claim but also 'grounds' on which the claim rests." Id. (citations omitted). Furthermore, "[p]leadings must be something more than an ingenious academic exercise in the conceivable." Marsh v. Butler County, 268 F.3d 1014, 1037 (11th Cir. 2001) (en banc). Unsupported conclusions of law or of mixed law and fact are not sufficient to withstand dismissal under Rule 12(b)(6). Marsh, 268 F.3d at 1036 n.16; see also South Florida Water Mgmt. Dist. v. Montalvo, 84 F.3d 402, 408 n.10 (11th Cir. 1996) (noting "as a general rule, conclusory allegations and unwarranted deductions of fact are not admitted as true in a motion to dismiss").

When, as in the instant case, a plaintiff brings 42 U.S.C. § 1983 claims and a defendant official asserts qualified immunity, the Plaintiff's factual pleading burden is heightened even further. GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998); Epps v. Watson, 492 F.3d 1240, 1242 (11th Cir. 2007). It is the Plaintiff's burden to allege sufficient specific supporting facts or face dismissal of his claims. Marsh, 268 F.3d at 1036 n.16; Montalvo, 84 F.3d at 408 n.10.

Recently, however, a *panel* of the Eleventh Circuit held that it had the authority – in contravention of established Eleventh Circuit rules – to overrule the heightened pleading standard. Randall v. Scott, 610 F.3d 701 (11th Cir. June 30, 2010). Eleventh Circuit rules explicitly forbid a panel from overturning the decision of another panel. United States v. Smith, 122 F.3d 1355, 1359 (11th Cir.1997) (per curiam). "While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court

8

decision must be clearly on point." Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1292 (11th Cir. 2003) (per curiam).  Nonetheless, the Randall panel found that a United States Supreme Court case – that did not mention the heightened pleading standard even in *dicta* – "effectively overturned" the Eleventh Circuit's heightened pleading precedent, and asserted that as the authority to overturn the heightened pleading standard.  Randall, 610 F.3d at 708-710 (discussing Ashcroft v. Iqbal, 556 U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

For purposes of preserving the issue, these Defendants assert that the heightened pleading standard remains applicable and ***must*** be applied to 42 U.S.C. § 1983 cases involving qualified immunity or the principles underlying qualified immunity and the very purpose of the immunity (protecting government officials from vexatious litigation and allowing them to do their jobs without fear of devastating financial consequences) will be destroyed.

**ARGUMENT**

The Plaintiff's claims against these Defendants are due to be dismissed for three reasons. First, because the Plaintiff was a convicted inmate, his Fourteenth Amendment claims are due to be dismissed.  Second, in their individual capacities, these Defendants are entitled to qualified immunity.  In their official capacities, these Defendants are not "persons" for purposes of any 42 U.S.C. § 1983 claims for money damages and the Plaintiff lacks standing to pursue claims for equitable relief.

**I.    THE PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS ARE DUE TO BE DISMISSED.**

Whether the Plaintiff was a pretrial detainee or convicted prisoner determines which constitutional amendment is applicable. The Eighth Amendment contains the rights of convicted prisoners while the Fourteenth Amendment's Due Process Clause governs the rights of pretrial detainees.  Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996).  The analysis under either amendment is the same.   Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir. 1985).

9

However, the Plaintiff cannot maintain claims under both amendments.  Cottrell, 85 F.3d at 1490.

While the Plaintiff attempts to have it both ways, he clearly cannot.  The Plaintiff alleges that he was "taken back" to Holman prison.  (Doc 1 at ¶ 14.)  These allegations clearly indicate the Plaintiff was a convicted prisoner.  Accordingly, he cannot maintain Fourteenth Amendment claims.  Cottrell, 85 F.3d at 1490.  Therefore, the Plaintiff's Fourteenth Amendment claims are due to be dismissed.  Id.

## II.    CORRECTIONS OFFICERS ARMSTRONG, CHANCEY, LANEY, AND HARRISON ARE ENTITLED TO QUALIFIED IMMUNITY IN THEIR INDIVIDUAL CAPACITIES.

The Plaintiff's federal individual capacity claims fail against these Defendants as a matter of law because they are entitled to qualified immunity.  "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Once determined that a defendant acted within his discretionary authority, courts use a two-part test to determine whether qualified immunity is proper.  In Saucier v. Katz, the Supreme Court directed courts to use the following two-part test to determine whether qualified immunity applies:  first, the court determines whether there was a constitutional violation; second, the court determines whether the constitutional right in question was clearly established at the time of the alleged violation of the right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Recently, however, the Court abandoned the rigid order of analysis enunciated in Saucier and held that courts are no longer required to first determine whether there was a constitutional violation.  Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818 (2009).

> On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as

mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

Pearson, 129 S. Ct. at 818.

### A. Corrections Officers Armstrong, Chancey, Laney, and Harrison Acted Within Their Discretionary Authority.

Once a public official has asserted the defense of qualified immunity, he bears the burden of proving that he was acting within his discretionary capacity. Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir. 1988). In order to establish that he is acting within his discretionary capacity, a public official asserting qualified immunity need only show "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." Id. at 1564 (quoting Barker v. Norman, 651 F.2d 1107, 1121 (5th Cir. 1981)). Courts should not be "overly narrow" in interpreting this requirement. Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994). To determine this question "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." Harbert Intern., Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998) (citation omitted). As one district court observed, "the determination that an officer was acting within his discretionary authority is quite a low hurdle to clear." Godby v. Montgomery County Bd. of Educ., 996 F. Supp. 1390, 1401 (M.D. Ala. 1999).

In the instant case, Corrections Officers Armstrong, Chancey, Laney, and Harrison acted within their discretionary authority. It is only by virtue of their positions as Corrections Officers that they came into contact with the Plaintiff. It cannot reasonably be argued that searching cells, searching inmates, and using force on resisting inmates is outside the scope of a Corrections

11

Officer's duties.  These Defendants therefore easily clear the low hurdle of establishing that they acted within their discretionary authority.  James, 157 F.3d at 1282.

**B.      Corrections Officers Armstrong, Chancey, Laney, and Harrison Did Not Violate the Plaintiff's Federally Protected Rights.**

The Complaint does not allege any facts from which it could be determined these Defendants violated the Plaintiff's rights.  The Plaintiff's claims against these Defendants are found in Counts I, II, III (Moon only), IV (Moon and Armstrong only), V (Moon and Armstrong only), VI (Armstrong and Chancey only), VII (Armstrong and Chancey only), VIII (all except Moon), IX (all except Moon), X (all except Moon), XIV (all except Moon).  Counts I, IX, and X appear to be based on the purchase and issuance of TASERs in the Houston County Jail.  Counts II and VI-VIII allege these Defendants used excessive force on the Plaintiff or failed to protect him.  Count III alleges an illegal strip search claim.  Count IV alleges Corrections Officers Moon and Armstrong violated the Plaintiff's First Amendment rights by retaliating against him following his filing of his first lawsuit.  Count V alleges a due process violation for failure to bring a supervisor to the Plaintiff's cell.  Count XIV alleges that the Plaintiff's Eighth Amendment rights were violated when he was placed in a "closet cell".

None of these Counts state a claim against these Defendants.  First, the Plaintiff was not subjected to excessive force.  Second, the Plaintiff was not subjected to an illegal strip search. Third, the conditions claim, placing the Plaintiff in the "closet cell" fail as a matter of law as the facts alleged do not show the Plaintiff's rights were violated.  Fourth, the Plaintiff's claims with respect to the TASERs fail as a matter of law because the Eleventh Circuit and other federal courts have clearly upheld their use.  Fifth, these Defendants did not retaliate against the Plaintiff.  Sixth, there is no right under the due process clause of the Fourteenth Amendment for an inmate to demand the presence of a supervisor prior to complying with the orders of corrections officers.

12

### 1.     Corrections Officers Armstrong, Chancey, Laney and Harrison did not use excessive force on the Plaintiff or fail to intervene.

The standard used in analyzing excessive force claims based on the Fourteenth Amendment has been described by the United States Supreme Court as follows:  "whether force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm."  Whitley v. Albers, 475 U.S. 312, 320-21 (1984); Bozeman v. Orum, 422 F.3d 125 (11th Cir. 2005).  In Hudson v. McMillian, the United States Supreme Court reasoned:

> [C]orrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmate. . . .  Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

503 U.S. 1, 6 (1992) (citations omitted).  The factors to be considered in evaluating whether the use of force was wanton and unnecessary include: 1) the need for application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the prison official; 4) any efforts made to temper the severity of a forceful response; and 5) the extent of the injury suffered by the inmate.  Whitley, 475 U.S. at 1085.

"The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."  Whitley, 475 U.S. at 319.[8]  In evaluating the challenged conduct of jail officials, a court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment.  Ort v. White, 813 F.2d 318, 322 (11th Cir. 1987).

---

[8] The Supreme Court of the United States has recognized that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  Graham v. Connor, 490 U.S. 386, 396 (1989); see also Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citing same principle in reference to excessive force claim in a prison context).

> Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. . . . That deference extends to prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.

Whitley, 475 U.S. at 321-322.  "[T]he courts give great deference to the actions of prison officials in applying prophylactic or preventive measures intended to reduce the incidence of riots and other breaches of prison discipline."  Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991).  "When the 'ever-present potential for violent confrontation and conflagration,' . . . ripens into *actual* unrest and conflict, the admonition that 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators,' . . . carries special weight."  Whitley, 475 U.S. at 321 (emphasis in original).  In Whitley, the court held that the "shooting [of an inmate in the leg] was part and parcel of a good-faith effort to restore prison security . . . [and] did not violate respondent's Eighth Amendment right to be free from cruel and unusual punishments."  475 U.S. at 319.

While placed in the context of a Fourth Amendment excessive force claim, courts have employed standards that are equally applicable to similar claims under the Fourteenth Amendment.  "In analyzing whether excessive force was used, courts must look at the totality of the circumstances."  Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280 (11th Cir. 2004).  "We must look at the situation not with hindsight, but with the eye of the objectively reasonable officer on the scene."  Garrett, 378 F.3d at 1281. Analyzing a use of force claim "requires an evaluation of the officers' reasonable apprehension to assess their responses to the circumstances confronting them, particularly in a rapidly evolving situation."  Carr v. Tatangelo, 338 F.3d 1259, 1268 n.17 (11th Cir. 2003).

14

With respect to the Plaintiff's failure to intervene allegations, the Eleventh Circuit has held that an officer who is present when another officer uses excessive force can be held liable for failing to intervene. Fundiller v. City of Cooper City, 777 F.2d 1436, 1441-42 (11th Cir. 1985). However, liability only arises if the defendant officer is **_actually in a position to intervene_** and fails to do so. Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998). When an officer has no reason to expect the use of excessive force until after it has occurred, there is no opportunity to intervene and no duty to prevent the alleged excessive use of force. Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996).

In the Factual Allegations, the only Defendant explicitly alleged to have used any force on the Plaintiff is Corrections Officer Leary. (Doc 1 at ¶ 10.) The Plaintiff makes allegations that he was shot with a TASER in the leg, shocked in the back, and kneed in the back and head. (Id. at ¶ 11.) The Plaintiff does **_not_** allege who used this force against him. In the Factual Allegations, none of these Defendants are explicitly alleged to have done anything to the Plaintiff. Additionally, there are no facts alleged from which the Court could either explicitly understand or infer that any of these Defendants were in a position to prevent any excessive force that could be found to have occurred. Accordingly, the Plaintiff's excessive force claims should be dismissed due to a lack of factual support for the excessive force and failure to intervene theories. Twombly, 550 U.S. at 555.

Even if the Complaint could be construed as alleging that these particular Defendants tased the Plaintiff and/or kneed him, they are still entitled to have the Plaintiff's claims against them dismissed. No doubt because of the videotape, the Plaintiff is forced to allege that no force was used against him prior to his refusal to come out of the cell. The Plaintiff alleges that he refused the order to come out of the cell and talk because a sergeant was not present.[9]

---

[9] As will be discussed below, the Plaintiff had no right to make such a demand and the Defendants were under no

Furthermore, he cannot be heard to argue that he feared coming out of the cell because he had already left it just minutes before without anything happening to him.  The Plaintiff's demands and fears ring especially hollow given that he admits that he was aware the entire incident was being videotaped.

The Plaintiff alleges that he was given no less than three opportunities to come out of the cell before he was tased the first time, including a warning that he would be tased if he did not come out.  It was only after all of this that the Plaintiff was first shot with the TASER.  The Plaintiff was able to pull the wires out and run out of the cell and from the officers.

With respect to the first use of force, the Complaint makes clear that the Plaintiff was being ordered out of the cell but refused.  There was a clear need to remove the Plaintiff from the cell as there were at least two other inmates in the cell with the Plaintiff that could have assisted him in resisting the officers or otherwise interfere in their investigation.  The officers attempted to mitigate the force by giving the Plaintiff three opportunities to come out of the cell and warning the Plaintiff of the force that would be used in the event he failed to comply.  The Plaintiff clearly was not seriously harmed as he alleges that at worst he was temporarily unable to breathe, but not so out of breath as to be unable to pull out the TASER wires and run out of the cell.  The Plaintiff has clearly not alleged that the first tasing was excessive.  Whitley, 475 U.S. at 1085; see also, Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (single one-time shocking with a TASER not a constitutional violation).

The Plaintiff admits that he was actively fleeing when he was tased the second time. (Doc 1 at ¶ 11 ("As BAILEY ran away from the officers he turned around, with his hands up and was shot again in the leg.").)  He was then kneed and tased a third time after falling to the floor before being handcuffed and shackled.  The use of force during this time is clearly justified as

---

constitutional obligation to accede to it.

the Plaintiff was actively resisting by fleeing from his cell and needed to be brought under control to prevent him from continuing to escape and/or injuring the officers. Just as when he was initially brought out of the cell, once the Plaintiff was under control, no further force was used. Clearly under the Whitley balancing test, the force used was necessary to capture an out-of-control inmate who was attempting to escape.

Finally, with respect to these claims, because no excessive force was used, the Plaintiff has not alleged a failure to intervene claim. The case law makes clear that before any duty arises, an officer must witness excessive force being used. Fundiller, 777 F.2d at 1441-42. Because the Plaintiff has failed to allege the condition precedent – the use of excessive force – none of these Defendants can be held liable for failing to intervene.

### 2.    The Plaintiff was not subjected to an illegal strip search.

The Fourth Amendment of the United States Constitution prohibits only unreasonable searches. Bell v. Wolfish, 441 U.S. 520, 558 (1979) (quoting Carroll v. United States, 267 U.S. 132, 147 (1925). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case, it requires a balancing of the need for a particular search against the invasion of personal rights that the search entails." Id. at 559. Thus, jailers and corrections officials should be "accorded wide deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id. at 547.

With regard to strip searches in particular, this means that "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 559. Strip searches are especially important because a detention facility "is a unique place fraught with serious security dangers." Id. "Smuggling of money, drugs, weapons, and other contraband is all too common

17

an occurrence." Id. For this reason, even body cavity searches, the most intrusive part of strip searches, may be conducted without running afoul of the Constitution. Id. at 559-560.

The Eleventh Circuit adopted the reasoning in Bell in Powell v. Barrett, 541 F.3d 1298 (2008). In that case, the Court stated that "[t]he need for strip searches at all detention facilities, including county jails, is not exaggerated. Employees, visitors, and (not least of all) the detained inmates themselves face a real threat of violence, and administrators must be concerned on a daily basis with the smuggling of contraband by inmates . . ." Id. at 1311. Accordingly, the Eleventh Circuit held that strip searches, even in front of other people, do not violate the Constitution. Id. at 1302.

Dispositively as it relates to the instant case, the Eleventh Circuit in Powell was presented with a booking process that required arrested persons to go into a large room with a group of up to thirty or forty other inmates, remove all of their clothing, and then take a shower in a single large room. The inmates were then required to either singly, or standing in a line with others, be visually inspected front and back by deputies. Powell, 541 F.2d at 1301. The Court found that, based on the reasoning in Bell, the process was permissible. Id. at 1302.

The Plaintiff was a prisoner in a county jail. The Complaint describes a thorough cell search and alleges the search was for contraband. (Doc 1 at ¶ 1.) That the Plaintiff was forced to squat and cough in front of other inmates during this process is of no constitutional concern. Powell, 541 F.2d at 1302. Accordingly, the Plaintiff's strip search claim is due to be dismissed.

### 3. The Plaintiff's conditions of confinement were constitutional.

The Plaintiff's conditions of confinement claims are due to be dismissed. Double-celling that provides even less than fifty square feet per inmate has also been found to not violate the Constitution. Rhodes v. Chapman, 45 U.S. 337, 348-49 (1981) (holding that double-celling in a small cell that required two inmates to share sixty-three square feet was not unconstitutional).

18

Rhodes (along with a bit of common sense) demonstrates why the Plaintiff's placement in the so-called "closet cell" is not a constitutional violation. A sixty-three square feet cell is a little less than eight feet wide by eight feet long. The Rhodes Court found that *two* prisoners could constitutionally share this space. This equates to roughly a 4 foot by 4 foot space per prisoner – about the size of a walk-in closet.

As noted in the facts, the time the Plaintiff was placed in the smaller cell coincides with normal sleeping hours. Even the duration coincides with the normal eight hour recommended sleep cycle. The undersigned are aware of no case law that requires jails to serve food during early morning hours, or upon the demand of an inmate. See, e.g., Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir. 1991) (stating "[t]he Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration.") Notably, the Plaintiff does not allege that he sought water or asked to use the toilet. Nothing in the Complaint suggests that the Plaintiff was placed in the cell as punishment or that he suffered any deprivation while in the cell. Had the Plaintiff been placed in a hotel room with kitchenette during this time, he would likely have slept through it.

As a final note on the Plaintiff's conditions claims, the Court should note that he does not allege any injury from being placed in the "closet cell". He suffered no deterioration, illness, or physical injury from these conditions. Marsh, 268 F .3d at 1028 ("[a] plaintiff must also show that the constitutional violation caused his injuries."). "While an inmate 'need not await a tragic event' before seeking relief, . . . he must at the very least show that a condition of his confinement 'pose[s] an unreasonable risk of serious damage to his future health' or safety . . ." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (citations omitted). The allegations in

the Plaintiff's Complaint do not meet this threshold requirement and should therefore result in the dismissal of the Plaintiff's conditions claims.

### 4.      TASERs are constitutional as a matter of law.

In Counts I, IX, and X, the Plaintiff alleges that these Defendants violated his federally protected rights by purchasing and issuing TASERs.  At the outset, the Plaintiff has failed to allege any facts that would support a finding that mid-level supervisors like these Defendants would be involved in a weapons selection/purchasing decision – such decisions usually rest with the sheriff or jail administrator.  Nonetheless, the Plaintiff's claims are clearly frivolous as case after case has upheld the use of TASERs.  See, e.g., Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (single one time shocking with a TASER not a constitutional violation); Burkett v. Alachua County, 250 Fed. Appx. 950, 952-53 (11th Cir. 2007) (no constitutional deprivation where Corrections Officers used TASER on mentally ill inmate); Mann v. Taser Intern., Inc., 588 F.3d 1291, 1306 (11th Cir. 2009) (finding no excessive force where handcuffed and shackled arrestee was tased three times); Forrest v. Prine, 620 F.3d 739, 745 (7th Cir. 2010); Lewis v. Downey, 581 F.3d 467, 477-78 (7th Cir. 2009) ("In a jail or prison setting, it is not hard to imagine any number of scenarios that would justify the [use of] ... taser guns."); Michenfelder v. Sumner, 860 F.2d 328, 336 (9th Cir. 1988) (policy of allowing use of taser guns on inmate who refuses to submit to a strip search does not constitute cruel and unusual punishment); Caldwell v. Woodford County, 968 F.2d 595, 600-01 (6th Cir. 1992) (use of stun gun and straight jacket on inmate who refused to obey Corrections Officers' orders did not violate Eighth Amendment); Cowart v. Smith, 2009 WL 3135011, *8 (M.D. Ala. 2009) (finding Corrections Officer did not use excessive force when tasing an inmate).

The Court should also note that the Plaintiff's requested injunctive relief flies in the face of his claims regarding TASERs.  Specifically, the Plaintiff requests that the Court enter an

20

injunction requiring the Defendants to "set in place strict guidelines for the use of tasers." (Doc 1 at p. 39.)  If TASERs are unconstitutional, no guidelines or policies could be set.  Regardless, as corrections officers, these Defendants do not have the authority to promulgate such policies.

In light of this crystal clear authority from the Eleventh Circuit, Sixth Circuit, Seventh Circuit, and Ninth Circuit, as well as decisions of this Court, the Plaintiff's claims that the purchase and use of TASERs is unconstitutional is frivolous.

### 5.    <u>These Defendants did not retaliate against the Plaintiff.</u>

To prevail on a First Amendment retaliation claim, the Plaintiff's Complaint must contain facts to support three elements: (1) his speech was constitutionally protected; (2) he suffered an adverse action that would deter an average person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the alleged retaliatory action and the protected speech.  <u>Smith v. Mosely</u>, 532 F.3d 1270, 1276 (11th Cir. 2008).  For purposes of the instant motion, these Defendants concede the Complaint alleges the first two elements.  However, it fails to allege facts supporting the third element – the Plaintiff has not alleged a causal connection.

The Court should note that none of these Defendants were defendants in the Plaintiff's earlier lawsuit.  The Plaintiff has pled no facts establishing that any of these Defendants were aware of the lawsuit other than Corrections Officer Armstrong, and then only after the initial cell and strip searches had been conducted.  The Complaint alleges that the search was ordered by Sgt. Buchmann who was not a Defendant in the first lawsuit.  The Complaint, therefore, is devoid of any causal connection between these Defendants' actions and the Plaintiff's protected speech.

Furthermore, the temporal connection to the Plaintiff's alleged speech, filing the lawsuit, and the incident is tenuous at best.  Over *three years* elapsed between the time the Plaintiff filed

21

his lawsuit and the events of August 13, 2008. (Exhibit A at p. 3.) Albeit in the employment context, the Eleventh Circuit has held that a substantial delay between the protected speech and the adverse action precludes a retaliation claim as a matter of law. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). The Plaintiff has therefore failed to allege a causal or temporal link to establish retaliation. See Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989) (requiring that a plaintiff allege that actions were taken because of the plaintiff's speech).

Furthermore, if the complained of action would have taken place in the absence of the protected speech, the Plaintiff still fails to state a claim of retaliation. Mosely, 532 F.3d at 1278. Here, the Plaintiff's cell was searched for contraband under the orders of a supervisor. The Plaintiff failed to obey repeated orders to come out of his cell in spite of warnings that force would be used. The Plaintiff verbally resisted the officers and actively resisted them by fleeing out of his cell. Any reasonable officer would have done as these officers did to any inmate displaying similar behavior. Consequently, even if the Plaintiff could establish a causal connection, under the facts alleged, these Defendants are still entitled to have the Plaintiff's retaliation claim dismissed.

### 6.      **Inmates do not have a Fourteenth Amendment Due Process right to have a supervisor present.**

The Plaintiff makes a claim for something that, as far as the undersigned are aware, has never been found to exist – a right to have a supervisor present during an inmate's interaction with corrections officers. After a diligent search, the undersigned were unable to find any case law from the United States Supreme Court, Eleventh Circuit, or the Alabama Supreme Court recognizing the existence of such a right. This Court should not be the first to recognize such a right.

22

It should be noted that the Plaintiff's earlier lawsuit involved claims against supervisory officers. In the context of the facts before the Court, there is no benefit to recognizing such a right – in the Plaintiff's view, at least according to the lawsuits he has filed, supervisors are just as likely to violate his rights as corrections officers. From a practical point of view, if there is a right to have a supervisor present at any time an inmate interacts with a corrections officer, then this Court will have abolished the lowest tier of a jail/prison's staff. Any encounter with an inmate has the potential to become adversarial and thereby needing a supervisor.

### C.    No clearly established law provided "fair warning".

The Plaintiff must show that clearly established law provided these Defendants with fair warning that their conduct was unlawful by either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or federal constitutional provision are specific enough to demonstrate conduct was illegal, even in the total absence of case law. Storck v. City of Coral Springs, 354 F.3d 1307, 1317 (11th Cir. 2003) (citations omitted). The Eleventh Circuit has identified the latter method as an "obvious clarity" case. Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted). In order to show that the conduct of the Defendants was unconstitutional with "obvious clarity," "the unlawfulness must have been apparent." Willingham v. Loughnan, 261 F.3d 1178, 1187-88 (11th Cir. 2001). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Storck, 354 F.3d at 1318 (quoting 28 F.3d at 1149).

The case law cited above makes clear that the Plaintiff cannot establish fair warning under either prong. None of the Plaintiff's claims state a constitutional violation. See, e.g. Whitley, 475 U.S. at 1085; Powell, 541 F.2d at 1302; Chandler, 379 F.3d at 1289; Marsh, 268 F

.3d at 1028; Draper, 369 F.3d at 1278; Burkett, 250 Fed. Appx. at 952-53.  With respect to the Plaintiff's novel theories (e.g., TASER purchase/use and supervisory presence), even if the Court were to agree with the Plaintiff that he has stated a constitutional violation, these Defendants would still be entitled to qualified immunity as the warning must have pre-existed the Defendants' actions.  Storck, 354 F.3d at 1318.

## III.    THE PLAINTIFF'S OFFICIAL CAPACITY CLAIMS ARE DUE TO BE DISMISSED.

The Plaintiff's official capacity claims are due to be dismissed for three reasons.  First, to the extent the Plaintiff seeks money damages from these Defendants in their official capacities, money damages are not available under 42 U.S.C. § 1983 for official capacity claims.  Second, the Plaintiff lacks standing to obtain the requested equitable relief.  Finally, the Plaintiff cannot satisfy the requirements for obtaining equitable relief.

### A.    For Purposes of the Plaintiff's Official Capacity Claims, These Defendants are not "Persons" for Purposes of 42 U.S.C. § 1983.

The official capacities claims must fail because 42 U.S.C. § 1983 prohibits a person, acting under color of law, from depriving another of his rights secured by the United States Constitution.  42 U.S.C. § 1983 (emphasis added).  The United States Supreme Court has held that state officials, in their official capacities, are not "persons" under § 1983.  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  Any official capacity claims against these Defendants should therefore be dismissed because they are not "person[s]" under § 1983.  Id.; Carr v. City of Florence, 916 F.2d 1521, 1525 n.3 (11th Cir. 1990).

### B.    The Plaintiff Lacks Standing.

The Plaintiff seeks to have the Court order the Defendants to promulgate strict guidelines on TASER use and forbid even the carrying of such weapons around him.  (Doc 1 at p. 39.)  Of course, as noted previously, such relief is not obtainable from these Defendants as they have no

24

ability to promulgate rules and regulations for the Houston County Jail.  However, even if they could, the Plaintiff has failed to allege facts that would grant him standing to seek such relief. Specifically, the Plaintiff has not alleged that he is being held in the Houston County Jail.[10]  In fact, he specifically has alleged that he was returned to Holman Prison shortly after the incident complained of.  (Doc 1 at ¶ 14.)

A plaintiff seeking the jurisdiction of the federal courts must show a personal stake in the outcome.  Baker v. Carr, 369 U.S. 186, 204 (1962).  The plaintiff must have sustained, or is about to sustain, some direct injury.  Golden v. Zwickler, 394 U.S. 103, 109-110 (1969).  Of direct relevance to the present case, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."  O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974).

In City of Los Angeles v. Lyons, the plaintiff alleged that he had been subjected to a chokehold by arresting officers in violation of his federally protected rights.  461 U.S. 95, 97 (1983).  The plaintiff sought an injunction barring the future use of police chokeholds.  Id. at 98. After the Ninth Circuit affirmed the district court's grant of a preliminary injunction, the United States Supreme Court reversed, holding that the plaintiff lacked standing.  Id. at 99-100.  The Court stated that the plaintiff's standing rested solely on pure speculation that he might be stopped by the police, might be arrested, and might be subjected to another chokehold.  Id. at 108.  The court noted that five months elapsed between the choking incident and the filing of the complaint and the plaintiff was not subjected to another chokehold.  Id.

The Plaintiff in the instant case is in a similar position as the plaintiff in Lyons.  Any request for equitable relief rests solely on speculation that he might return to the Houston County Jail, might again refuse to follow orders, and might again have to be tased in order to get him

---

[10] Nor can the Plaintiff make such an allegation and survive a Rule 11 Motion as he and his attorney know full well that he is currently serving life without parole at Holman Prison.

under control.  Such speculation into future conduct, even if it did violate the Plaintiff's rights, does not afford them standing to seek equitable relief against these Defendants in their official capacities.  Lyons, 461 U.S. at 108.

**C.      The Plaintiff Cannot Assert Facts to Support the Court Granting Equitable Relief.**

The Plaintiff must satisfy three elements to justify injunctive or other equitable relief against these Defendants.  First, he must succeed on the merits (in this context, he must show an actionable wrong).  Second, he must show the existence of a continuing irreparable injury.  Finally, he must prove that he has no other adequate relief at law.  Newman v. State of Alabama, 683 F.2d 1312, 1319 (11th Cir. 1982).  The Plaintiff cannot establish any of these elements.

First, the Plaintiff cannot show an actionable injury caused by Corrections Officers Armstrong, Chancey, Laney, or Harrison.  As set forth above, the Plaintiff has not pled any facts from which the Court could conclude that any of these Defendants committed an actionable wrong.  However, even if the Complaint could be construed as making out an actionable wrong committed by these Defendants, it does not contain allegations establishing the second element.  In particular, there is no continuing irreparable injury.  The Plaintiff alleges that he was returned to prison and has not alleged that he has returned to Houston County since sometime in August 2008 – roughly two and one-half years ago.  (See generally Doc. 1.)

Finally, the Plaintiff cannot realistically argue that he has no adequate remedy at law. The Plaintiff has brought individual capacity claims for money damages against all of the Defendants.  Moreover, the Defendants' entitlement to qualified immunity does not deprive him of an adequate remedy.  See Rittenhouse v. DeKalb County, 764 F.2d 1451, 1459 (11th Cir. 1985).  It is sufficient that the Plaintiff has the opportunity to adjudicate the question.  Id. Accordingly, because the allegations fail to establish the elements necessary to obtain an injunction or other equitable, Corrections Officers Armstrong, Chancey, Laney, and Harrison, in

26

their official capacities, are entitled to a dismissal of the Plaintiff's official capacity § 1983 claims as a matter of law.

## CONCLUSION

Based upon the foregoing, Corrections Officers Armstrong, Chancey, Laney and Harrison request that the Court issue an Order dismissing them from this action.

Respectfully submitted this 22nd day of February, 2011.

<u>s/Gary L. Willford, Jr.</u>
GARY L. WILLFORD, JR., Bar No. WIL198
Attorney for Defendants Corrections Officers Joseph Armstrong, Adam Chancey, Kenneth Laney, and John Harrison
WEBB & ELEY, P.C.
7475 Halcyon Pointe Drive (36117)
Post Office Box 240909
Montgomery, Alabama  36116
Telephone:  (334) 262-1850
Fax:  (334) 262-1889
E-mail:  gwillford@webbeley.com

<u>s/Gary C. Sherrer</u>
GARY C. SHERRER, Bar No. SHE016
Attorney for Defendants Corrections Officers Joseph Armstrong, Adam Chancey, Kenneth Laney, and John Harrison
SHERRER, JONES & TERRY, P.C.
335 West Main Street
Dothan, AL 36301-1613
Telephone:  (334) 678-0100
Fax:  (334) 678-0900
E-mail:  gary@sherrerjones.com

27

## CERTIFICATE OF SERVICE

I hereby certify that on this the 22nd day of February, 2011, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide notice to the following CM/ECF participants:

Allen Kenneth Mitchell, Esquire
Attorney at Law
707 West Main Street
Dothan, AL  36301

Charles Neville Reese, Esquire
Reese & Reese
P. O. Drawer 250
Daleville, AL  36322-0250

Stephen Parrish Dees, Esquire
Fred White Tyson, Esquire
Rushton, Stakely, Johnston & Garrett, P.A.
P. O. Box 270
Montgomery, AL  36101-0270


**s/Gary L. Willford, Jr.**
Of Counsel